

AO 91 (REV.5/85) Criminal Complaint    AUSA Vikas Didwania (312) 353-0517

**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 24 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

EDUARDO ROMAN

**CRIMINAL COMPLAINT**

CASE NUMBER: **16CR 206**

UNDER SEAL

**MAGISTRATE JUDGE COLE**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: Beginning no later than December 9, 2015 and continuing until on or about January 25, 2016, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere, EDUARDO ROMAN defendant herein:

not being a licensed importer, manufacturer, or dealer, willfully engaged in the business of dealing in firearms;

in violation of Title 18, United States Code, Section 922(a)(1)(A). I further state that I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
Jason Haugh
Special Agent, Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn to before me and subscribed in my presence,

March, 24, 2016
Date

Chicago, Illinois
City and State

_____
Signature of Judicial Officer

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                                   )    ss
NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, Jason J. Haugh, being sworn, depose and state the following:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have been so employed by the ATF since January of 2015 and I am currently assigned to the ATF Chicago Field Division. My responsibilities include investigating individuals suspected of violating federal laws regulating the sale, distribution, and possession of firearms.

2. This affidavit is made in support of a criminal complaint alleging that Eduardo ROMAN has violated Title 18, United States Code, Section 922(a)(1)(A). This affidavit is also made for the purpose of establishing probable cause in support of warrants to search (a) the first floor, basement, and detached garage of the multi-family residence located at 2447 W. Fargo Ave., Chicago ("**Subject Premises**"), which is further described below and in Attachment A to the respective Application, and to seize evidence relating to the commission of offenses in violation of Title 18, United States Code, Section 922(a)(1)(A), as further described in Attachment B to the respective Application; and (b) the Snapchat[1] social media account kangbroadway ("**Subject Account 1**"), which is further described below and in Attachment A to the respective Application, and to seize evidence relating to the commission of offenses in violation of Title 18, United States Code, Section 922(a)(1)(A), as further described in Part III of Attachment A to the respective Application.

---

[1] Snapchat is headquartered at 1459 18th St., #313, San Francisco, CA 94107.

3. This affidavit is based upon my own personal observations and knowledge, information received from other law enforcement officers and witnesses, review of consensual recordings, and surveillance observations. Because this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging that Eduardo ROMAN violated federal firearms laws, it does not include each and every fact known to me concerning this investigation.

4. On the basis of that information and the facts I allege below, I submit that there is probable cause to believe that beginning no later than December 9, 2015 and continuing until on or about January 25, 2016, Eduardo ROMAN, not being a licensed importer, manufacturer, or dealer, willfully engaged in the business of dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A).

## FACTS ESTABLISHING PROBABLE CAUSE[2]

5. In December 2015, the ATF began conducting an investigation concerning Eduardo ROMAN, a Latin King gang member, from the Claremont and Rosemont section of Chicago.

6. In December 2015, an ATF confidential source, CS-1,[3] revealed that a Hispanic male named "Barrel" was advising CS-1 that he had firearms for sale. Law enforcement

---

[2] At various points in this affidavit, I will offer my understanding and interpretation of certain statements, including intercepted or recorded conversations, in parenthetical comments. My understanding and/or interpretation of these conversations is based upon the contents of the conversations, the context of both prior and subsequent conversations, information received from CS-1 and ATF agents, my knowledge derived from this investigation, and my experience and familiarity with firearms trafficking. Except as noted, the summaries of conversations contained in this affidavit that occurred in relation to the controlled purchases of firearms represent a review of the audio and video recordings and do not represent finalized transcripts of the conversations and may not represent the entire conversation that occurred between the identified individuals. In addition, the language that is quoted from conversations not recorded is based on the memory and recitation of the informant.

[3] CS-1 has been arrested approximately 9 times and has 4 criminal convictions (2 for robbery-related and 2 for narcotics-related offenses). To date, ATF has paid CS-1 a total of approximately $5,600 in

conducted a criminal history check which revealed that "Barrel" was Eduardo ROMAN. A photograph of ROMAN was shown to CS-1 and CS-1 verified that the photograph was the man he/she knew as "Barrel" and who had offered CS-1 firearms for sale.

7. A search of law enforcement databases confirmed that ROMAN does not have a federal firearms license to deal in firearms.

8. On February 26, 2016, ATF interviewed ROMAN. ROMAN told the agents that he had sold approximately 10-15 firearms since November 2015 to two or three people.

### DECEMBER 9 CONTROLLED BUY

9. On December 9, 2015, CS-1 advised ATF agents that he/she had been to ROMAN's house and ROMAN had three firearms for purchase. At the direction of ATF agents, CS-1 advised ROMAN in an unrecorded telephone conversation that he/she would purchase the firearms. According to CS-1, ROMAN text messaged three photos of the firearms being offered for purchase. CS-1 provided the photos to ATF agents.

10. At approximately 2:54 p.m., in the presence of ATF agents, CS-1 placed a recorded telephone call to ROMAN at (872) 281-1430.[4] Based on a review of a law enforcement database, this phone number is registered to Andres ROMAN in Chicago. ROMAN gave CS-1 directions to the **Subject Premises** and later during the conversation confirmed again that CS-1 was just coming to his "crib," meaning his house. During the interview with law enforcement on February 26, 2016, ROMAN provided his home address as 2447 W. Fargo Ave., Chicago (the

---

exchange for his/her assistance in this investigation. CS-1 has been assisting law enforcement since September 2014 and has provided both ATF and the Chicago Police Department with information that has been proven reliable and that has resulted in the recovery of narcotics, firearms, and ammunition. Information provided to law enforcement by CS-1 has been further corroborated by recorded conversations and controlled purchases of firearms and narcotics.

[4] The time on the digital recorder was off by one hour and displayed as 3:54 p.m. The voice identification of ROMAN for phone conversations is based on a review of video recordings that show ROMAN talking.

**Subject Premises**) and the residence is registered to Andres and Martha ROMAN according to a review of law enforcement database.

11. Agents searched CS-1 for contraband, money, firearms and drugs with negative results. CS-1 was fitted with an audio and video recording device, transmitter, and provided with $800.

12. Another confidential source, CS-2,[5] drove CS-1 in an undercover vehicle to the vicinity of the **Subject Premises**. Prior to leaving the staging area, CS-2 was also searched for contraband, money, firearms, and drugs, with negative results. The ATF undercover vehicle remained under law enforcement surveillance during its journey from the staging area to the alley behind the **Subject Premises**.

13. At approximately 3:12 p.m., surveillance observed the CSs, in the undercover vehicle, park on the west side of Campbell Avenue in between Fargo Avenue and Jarvis Avenue. CS-1 advised that he/she made a phone call to ROMAN who told CS-1 to turn into the alley behind the **Subject Premises**. At approximately 3:13 p.m., surveillance observed the CSs drive into the south alley off Campbell Ave. According to CS-1 and audio and video recordings, the undercover vehicle parked in the alley behind the **Subject Premises** and ROMAN opened the garage door for CS-1 and both of them walked through the garage and into the **Subject Premises**. CS-1 went into the kitchen of the residence with ROMAN.

---

[5] CS-2 has been arrested approximately 8 times and has 2 criminal convictions (for narcotics). To date, ATF has paid CS-2 a total of approximately $3,000 in exchange for his/her assistance in this investigation. CS-2 has been assisting law enforcement since February 2006 and has provided both ATF and the Chicago Police Department with information that has been proven reliable in the past and that has resulted in the recovery of narcotics, firearms, and ammunition. Information provided to law enforcement by CS-2 has been further corroborated by recorded conversations and controlled purchases of firearms and narcotics.

14. According to CS-1, ROMAN showed him/her the three handguns.[6] CS-1 advised that ROMAN then explained to him/her how each of the firearms worked (a firearm can be heard in the video due to ROMAN moving the slide portion of the firearm back and forth). ROMAN mentioned that one of the guns "comes with a scope" and showed CS-1 where the scope screws in. ROMAN then told CS-1 that ROMAN was "going to wipe them down (to remove fingerprints)." ROMAN asked CS-1 if he/she knew how to load "this bitch (the firearm)." ROMAN showed CS-1 how "to press this button" in order to remove the "clip." ROMAN then told CS-1 that what he was holding was a "futuristic-ass gun." According to CS-1, he/she then gave ROMAN $800 and took the three firearms.

15. According to the video, ROMAN continued to explain to CS-1 how to operate the guns, explaining "how you cock this bitch back" and how the "safety is right there." A few minutes later, CS-1 left ROMAN's house.

16. CS-2 drove CS-1, while under law enforcement surveillance, to a predetermined location to meet with ATF agents. Agents took custody of the firearms and both CSs were searched for contraband with negative results.

17. The firearms were identified as a Smith & Wesson .22 revolver, Model 617; Beretta .22 pistol, Model U22 Neos; and Thompson Center .357 Contender Model. Subsequent testing confirmed that all three firearms were operational.

### JANUARY 25 CONTROLLED BUY

18. On January 12, 2016, agents gave CS-1 an ATF mobile phone for use in the investigation, including communicating with ROMAN. This phone line automatically records

---

[6] Given the angle of the camera on CS-1's recording device, the video recordings described in the affidavit rarely show what any participant to the transaction is holding. This applies to all the transactions discussed in this affidavit. As relevant here, some of the instances where a participant's face or what a participant is holding is visible is expressly noted.

phone calls and text messages between CS-1 and ROMAN. Unless explicitly stated otherwise, phone calls and text messages between ROMAN and CS-1 beginning on January 12 were consensually recorded.

19. On January 19, 2016, at approximately 3:01 p.m., ROMAN sent CS-1 a text message stating, "Add me on Snapchat! Username: kangbroadway." At approximately 3:26 p.m., CS-1 replied, "try to add me this shit tweaking on my phone" and provided his/her Snapchat username.

20. Snapchat is an application for mobile phones with iOS or Android operating systems that allows users to privately exchange messages called "snaps." These snaps self-delete after a few seconds of being read and the ATF mobile phone does not automatically record the snaps. CS-1 has advised that starting on January 19 some of his/her conversations with ROMAN have occurred through Snapchat. As relevant here, these conversations have not been reviewed by law enforcement unless specifically noted otherwise.

21. On January 23, 2016, at approximately 2:00 p.m., CS-1 called ROMAN. ROMAN advised that "I'm gonna call this brother, man, to see what's up with him and then call my other guy and see what's up with him" and then "I'll let you know" (referring to what firearms may be available).

22. On January 24, 2016, at approximately 2:13 p.m., CS-1 called ROMAN. ROMAN said he wanted $350 for the Deuce (a .22 caliber firearm) and $350 for a .38 that was "beat up."

23. At approximately 7:42 p.m., ROMAN called CS-1. ROMAN advised that "[I] have them two right now (referring to firearms)" but that he would hit some others up now "to see what's up." CS-1 and ROMAN agreed to meet at the **Subject Premises** the next day.

24. On January 25, 2016, at approximately 10:04 a.m., CS-1 called ROMAN. CS-1 advised ROMAN that he/she was "already en route." CS-1 also clarified a message he/she had received from ROMAN through Snapchat.[7] The message had informed CS-1 to bring extra cash for more guns ROMAN may get from his guy. ROMAN explained that the other guy (referring to his supplier) "was gonna be there before you [CS-1] get here," which meant ROMAN may have even more guns to offer for purchase. CS-1 advised that he/she would bring extra cash.

25. Agents met with CS-1 and CS-2 for the purpose of conducting a controlled purchase of two firearms from Eduardo ROMAN. Both CSs were searched and no contraband, money, firearms, or drugs were located. CS-1 was fitted with an audio and video recording device, transmitter, and provided with $1500.

26. CS-2 then drove CS-1, while under law enforcement surveillance, to the **Subject Premises**. At approximately 11:15 a.m., ROMAN called CS-1. CS-1 told ROMAN he/she was about to pull up to the **Subject Premises**. According to CS-1, ROMAN responded that his boy (referring to his supplier) was about to "dip (meaning leave the **Subject Premises**)."

27. At approximately 11:21 a.m., surveillance observed the undercover vehicle pull into the alley behind the **Subject Premises**. According to the audio and video recordings, at approximately 11:22 a.m., CS-1 exited the vehicle and went along the side of the garage and into ROMAN's basement.

28. According to CS-1, ROMAN was cleaning the guns and indicated that his boy had just left. CS-1 commented about the "deuce (a .22 caliber gun)" that "damn that motherfucker is clean" and ROMAN responded "Yeah." In discussing a part of the .22 caliber

---

[7] CS-1 provided law enforcement with a photo of the Snapchat message, which states "Bring extra cash like 750 or 8 I'm meeting [indecipherable] my boy in a bit." The message was sent by ROMAN's username "kangbroadway".

gun, ROMAN commented, "that's like supposed to be probably like to help you aim." CS-1 then asked, "This motherfucker got some shit in it or no? (referring to whether it was loaded)" and ROMAN responded, "Nah, I got some right here if you want." At approximately 11:23 a.m., ROMAN also told CS-1 that someone else took the "beat up" .38 caliber gun they had previously discussed. ROMAN later explained that his supplier had traded the .38 caliber gun for the .45 caliber gun he was selling to CS-1.

29. ROMAN also explained to CS-1 how the firearms worked. ROMAN explained about the .22 caliber gun that you "cock it all the way back King and then pre-cock it." At approximately 11:24 a.m., ROMAN showed CS-1 a .45 caliber gun. At approximately 11:26 a.m., CS-1 and ROMAN then discussed the prices for the firearms. ROMAN asked for $350 for the .22 caliber gun. For the .45 caliber gun, ROMAN said he paid $650 for it. He would take $700 for the .45 caliber unless CS-1 wanted to be "generous" and would give him $750. ROMAN can be seen on the video recording at various points during the transaction.

30. CS-1 gave ROMAN $1100 for the two firearms. According to the audio and video recordings, at approximately 11:35 a.m., CS-1 expressed safety concerns because one of the firearms appeared to be loaded. CS-1 asked ROMAN, "How do you turn the safety on?" ROMAN expressed to CS-1 not to be concerned because "you got to cock that bitch back" to operate it. He further explained, "I guess the trigger has to be back already king [indecipherable], for the safety to go up" and that "the safety is already on."

31. At approximately 11:40 a.m., once the transaction was completed, according to the audio and video recording, CS-1 left the residence and entered the undercover vehicle. CS-2 drove the undercover vehicle, while under law enforcement surveillance, to a predetermined location where agents took custody of the firearms and the remaining $400. Both CSs were

searched but no contraband was located. The firearms were identified as a .22 Colt Revolver; and a .45 Colt pistol. Subsequent testing confirmed that both firearms were operational.

### PROBABLE CAUSE TO SEARCH THE SUBJECT PREMISES

32. As set forth in this affidavit, I believe the facts establish probable cause that ROMAN committed violations of Title 18, United States Code, Section 922(a)(1)(A).

33. This affidavit is also made for the purpose of establishing probable cause in support of a warrant to search the premises of the **Subject Premises** identified in Attachment A to the respective Application, and to seize the records, documents, and items, as further described in Attachment B to the respective Application.

34. As described above, CS-1 purchased firearms from ROMAN at the **Subject Premises** on several occasions. I submit that there is probable cause to seize cell phones found at the **Subject Premises** that belong to or are used by ROMAN.

35. ROMAN used a mobile phone to conduct the firearms transactions with CS-1. Specifically, as described above, CS-1 and ROMAN communicated through the phone to discuss the types of firearms available for purchase, the prices of the firearms, and the logistics of the transactions, as well as send photos and text messages regarding the firearms.

36. In addition, because ROMAN told agents he has supplied firearms to others, his phone is likely to contain information about other such transactions and the identities of his other customers.

37. As described above, ROMAN uses the Snapchat application on his phone to conduct his firearms transactions. ROMAN's phone may contain information about his use of Snapchat to conduct his firearms transaction. A forensic analysis of the phone, and of the Snapchat application on the phone, can reveal:

    a. Certain elements of chat communications within the application that can be downloaded and saved by the receiver;

    b. Snapchat messages that were saved the by the receiver on the phone;

    c. Images or videos posted by the Snaphchat user to the "My Story" or "Our Story" features of the service.

38. ROMAN's residence is a multi-unit residential building located at 2447 W. Fargo Ave., Chicago (the **Subject Premises**), as more fully described in Attachment A.

39. Law enforcement believes that ROMAN lives at this residence. The controlled buys with ROMAN described in this affidavit occurred at the **Subject Premises**. CS-1 met ROMAN at the residence, where the firearms were kept, and the exchanges occurred on the first floor and in the basement. As described above, ROMAN also had access to the detached garage of the residence. He opened the garage door for CS-1 and led CS-1 through the garage. Prior to the December 9 controlled buy, ROMAN referred to this residence as his "crib," meaning his home.

40. In addition, the residence is registered to Andres and Martha ROMAN.

41. ROMAN provided his residence as 2447 W. Fargo Ave., Chicago (the **Subject Premises**) during the February 26, 2016 interview with law enforcement.

42. Because ROMAN is a firearms trafficker and resides at the **Subject Premises**, there is probable cause to believe that ROMAN stores evidence as set forth in Attachment B at the residence. Therefore, I respectfully request that the Court issue a search warrant authorizing the search of ROMAN's residence, as described in Attachment A, for the items described in Attachment B.

## PROBABLE CAUSE TO SEARCH THE SUBJECT ACCOUNT

43. As set forth in this affidavit, I believe the facts establish probable cause that ROMAN committed violations of Title 18, United States Code, Section 922(a)(1)(A).

44. This affidavit is also made for the purpose of establishing probable cause in support of a warrant to search **Subject Account 1** which is further described below and in Attachment A to the Application, and to seize evidence relating to the commission of offenses in violation of Title 18, United States Code, Section 922(a)(1)(A), as further described in Part III of Attachment A to the Application.

45. Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos. Snapchat is a messaging application for mobile phones with Apple's iOS operating system and Google's Android operating system. Snapchat offers three primary ways for users to communicate with each other.[8]

46. **Snaps.** A user takes a photo or video using their camera phone in real-time. The user then selects a time limit of 1-10 seconds for the receiver to view the photo or video. A user can elect to have the photo/video saved in their phone's photo gallery or just sent via Snapchat, without being saved. The photo/video can then be sent to a friend in Snapchat. The snap is deleted after the selected amount of time. If a recipient attempts to take a screenshot of the snap to save on his/her phone, the application will notify the sender of this behavior.

47. Snapchat states that it deletes each snap from its servers once all recipients have viewed it. If a snap has not been viewed by all recipients, Snapchat states that it retains the snap for thirty days.

---

[8] Snapchat Law Enforcement Guide, available at https://www.snapchat.com/static_files/lawenforcement.pdf?version=20150604.

48. **Stories.** A user can also add the photo/video Snap to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours.

49. **Chat.** A user can also type messages to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that he or she wants to keep. The user can clear the message by tapping it again.

50. On February 23, 2016, the U.S. Attorney's Office sent Snapchat a request to preserve all records associated with the **Subject Account 1** for ninety days pursuant to 18 U.S.C. § 2703(f). On February 24, 2016, Snapchat communicated that it was complying with the preservation request.

51. At approximately 3:01 p.m. on January 19, 2016, ROMAN sent CS-1 a consensually recorded text message stating, "Add me on Snapchat! Username: kangbroadway" (**Subject Account 1**). At approximately 3:26 p.m., CS-1 replied, "try to add me this shit tweaking on my phone" and provided his/her Snapchat username.

52. Described above is a controlled buy from ROMAN that took place after January 19, 2016. CS-1 has advised that starting on January 19 some of his/her conversations with ROMAN regarding the purchase of firearms have occurred through Snapchat including the exchange of text messages and photos through Snapchat. For example, on January 25, 2016, CS-1 received a message from ROMAN through Snapchat. CS-1 provided law enforcement with a photo of the Snapchat message, which states "Bring extra cash like 750 or 8 I'm meeting

[indecipherable] my boy in a bit." The message was sent by ROMAN's username "kangbroadway".

53. Based on my training and experience in other investigations, I believe that a search of social network provider account contents often of individuals engaged in criminal conduct yields investigative leads relating to:

    a. the identities of suppliers, co-conspirators, customers, and other individuals engaged in firearms offenses;

    b. the contact information of suppliers, co-conspirators, customers, and other individuals engaged in firearms offenses;

    c. the timing of communications among suppliers, co-conspirators, customers, and other individuals involved in firearms offenses; and

    d. the methods and techniques used in firearms offenses.

## CONCLUSION

54. Based on the foregoing, I submit that there is probable cause to believe that beginning no later than December 9, 2015 and continuing until on or about January 25, 2016, Eduardo ROMAN, not being a licensed importer, manufacturer, or dealer, willfully engaged in the business of dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A).

FURTHER AFFIANT SAYETH NOT.

_____
Jason Haugh, Special Agent
Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me
this 24th day of March, 2016.

_____
JEFFREY COLE
MAGISTRATE JUDGE